**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**FORT WORTH DIVISION**

| | |
|---|---|
| BROADSTREET, INC., BROADSTREET GLOBAL FUND, L.L.C., BROAD STREET GLOBAL MANAGEMENT, L.L.C., DAVID FEINGOLD, JOSEPH BALDASSARRA, and STEVEN BALDASSARRA, *Plaintiffs*, <br> v. <br> SECURITIES AND EXCHANGE COMMISSION, *Defendant.* | Civil Action No. 4:24-CV-00803-O <br> **JURY TRIAL DEMANDED** |

**AMENDED COMPLAINT FOR DECLARATORY JUDGMENT AND INJUNCTIVE RELIEF**

Broadstreet, Inc. ("B.S.I."), Broadstreet Global Fund, L.L.C. ("BSGF"), Broadstreet Global Management, L.L.C. ("BSGM"), David Feingold ("Feingold"), Joseph Baldassarra ("Joseph Baldassara"), and Steven Baldassarra ("Steven Baldassara"), through their undersigned counsel, for their Complaint against Defendant Securities and Exchange Commission ("S.E.C."), allege as follows:

**INTRODUCTION AND SUMMARY**

1. This is an emergency action involving one of the largest private infrastructure development organizations in the United States (Plaintiff Broadstreet, Inc. or "B.S.I."). B.S.I. is producing approximately 30,000 homesites for some of the largest homebuilders in the United States (including Texas based homebuilders and financial institutions, all with locations in Fort Worth, Texas). The S.E.C.'s refusal to respect and apply the laws of the Fifth Circuit Court of Appeals and the United States Supreme Court potentially jeopardizes the construction of thousands of housing units and dozens of housing projects.

2. Specifically, the S.E.C. has explicitly indicated that it will not comply with the principles set out in recent case law, including the recent US Supreme Court case, *Loper Bright Enterprises v. Raimondo*, 144 S. Ct. 2244 (2024), and the Fifth Circuit Court of Appeals decision in *Nat'l Association of Private Fund Managers v. S.E.C.,* 103 F.4th 1097, 1101 (5th Cir. 2024). Particularly, the S.E.C. is threatening to file a lawsuit against B.S.I. and its Chief Executive Officer, Plaintiff David Feingold, which could lead to the triggering of various "bad boy" or "event of default" provisions in hundreds of millions of dollars in loan documents and real estate related transactions, thereby causing the ceasing of funding of housing projects, the loss of thousands of jobs and overall potential chaos in the housing market. The impetus of this action is the S.E.C.'s two-year investigation involving the Plaintiffs with the S.E.C.'s knowledge of the dire

consequences, including job losses, housing losses, and economic chaos on local economies, and its refusal to discuss such matters in complete disregard for its lack of authority to do so. The S.E.C. previously acknowledged that the case would have been closed without action if the Plaintiffs were a small firm with few assets. However, the Plaintiffs are involved in an enormous enterprise with hundreds of millions of dollars invested. The S.E.C. further ignores that virtually all the investors (now estimated at greater than 97%) signed an acknowledgment confirming acceptance of the business practices of not only BSGF but the Broadstreet universe of entities, and the S.E.C., angered by the execution of such a document by investors, treated this investors' acknowledgment with disdain as such acknowledgment eviscerates the S.E.C.'s position. The investors have approved on multiple occasions and in various manners (not just said acknowledgment) that which the S.E.C. seeks to regulate and which both the *Loper* and *Private Funds* cases do not permit regulation by the S.E.C. In short, the S.E.C. refuses to accept what is the law of the land and has consciously decided to ignore it. This behavior is the most dangerous level of conduct by a governmental agency. As discussed below, some of the retaliatory conduct practiced by the S.E.C. is not only shocking but directly contradicts its internal manuals and pronouncements of its leadership.

3. In particular, attached as Exhibit "A" is a letter dated April 19, 2024 in which C.E.O. Feingold advised the S.E.C. of potentially precarious consequences to its actions and the desire to have a confidential settlement discussion or meeting with senior S.E.C. officials to discuss the ramifications of even having the S.E.C. file an action against the Plaintiffs. The S.E.C. has ignored this correspondence. Instead, it has taken retaliatory actions against the Plaintiffs and has clearly indicated its complete disregard for the irreparable harm likely to occur from the S.E.C.'s actions.

4. On September 1, 2024, after filing this lawsuit, counsel for Plaintiffs wrote counsel for the S.E.C. to further complain about the two-year "investigation" and reiterated Plaintiffs willingness to discuss this matter with the S.E.C. *See* Exhibit "B." The S.E.C. did not respond to that letter either.

5. During its investigation of Plaintiffs, the S.E.C. has issued certain sanctions affecting Plaintiffs' freedoms.[1] During the November 14, 2024 hearing in this matter, however, the S.E.C. took the position that the S.E.C. employees who issued those sanctions to Plaintiffs on behalf of the S.E.C. ***had "no authority whatsoever" to do so and that such sanction is not an act by the S.E.C.***

6. The S.E.C. further stated that Plaintiffs could complain to the SEC or to "the Bar" if they thought the sanctions issued were not warranted but not this Court.

7. In sum, the S.E.C.'s position is that Plaintiffs have to guess whether a sanction issued by an S.E.C. employee acting in his or her official capacity during an S.E.C. investigation is an act by the S.E.C.

8. Plaintiff BSGF is a private investment fund that Joseph and Steven Baldassarra manage through BSGM.[2] BSGF offers various series and subseries in which sophisticated, non-retail investors can invest, including the housing infrastructure projects discussed herein. As shown in the website (www.broadstreetprivateequity.com), the Plaintiffs are collectively involved in

---

[1] The SEC had an opportunity to submit evidence contradicting that of Plaintiffs concerning the sanctions but did not do so. Accordingly, at a hearing on November 14, 2024 in this matter, this Court accepted all such sanctions as true.

[2] BSGF is exempt from the Investment Company Act of 1940 (the "Investment Company Act") and operates by utilizing the exempt transaction rules as promulgated by the S.E.C. and thereby need not register any of its securities with the S.E.C.

funding and creating the infrastructure for housing projects that satisfy America's shortage of affordable housing and assist in the creation of countless jobs, economic benefits and the general welfare of a primary tenant of society, shelter. The infrastructure projects are overseen by B.S.I., of which David Feingold is the Chief Executive Officer. BSGF's operating documents, formation documents, resolutions, bank accounts, brokerage accounts, and day-to-day practices illustrate that Feingold holds no formal or informal role in BSGF and has no decision-making authority in BSGF.

9. Still, the S.E.C. seeks to regulate B.S.I.'s and BSGF's activities, which do not fall within the scope of its lawful authority to "regulate" securities. Indeed, B.S.I. does not offer any securities or conduct business within the securities industry; it simply manages and assists in creating and overseeing real estate development, infrastructure, and related projects involving large home builders. BSGF is a private fund that the S.E.C. also has no authority to control. Ignoring this reality and recent case law, however, the S.E.C. has taken actions that indicate that it may, although it has no credible evidence, take action against one or all of the Plaintiffs and thereby trigger enormous and havoc—creating events of default in loan documents, financing arrangements, development contracts and the overall operations of potentially thousands of homes.

10. While the S.E.C. may freely run its investigations, it must act within the statutory language and legislative intent determined by Congress. Indeed, while the S.E.C. may "regulate," it may not be the arbiter of *how* it may "regulate," a term not defined by statute. Congress and the Constitution solely determine that. Therefore, many of the actions discussed below which the S.E.C. has done could not be reasonably interpreted as "regulation," as referenced in the statute, as the Supreme Court's *Loper* decision makes clear. Under this authority, the S.E.C. may not freely interpret a statute at its sole discretion and make an arbitrary definition of what the term "regulate" or "regulation" means, as Congress has not authorized the acts of the S.E.C. listed below. Further,

the Fifth Circuit Court of Appeals made it abundantly clear in the Private Funds case referenced above that Private Funds such as Plaintiff B.S.I. may not be regulated by the S.E.C., especially in the manner described below.

11. Where this misappropriation of authority occurs, immediate Article III Federal court oversight of the administrative agency is imperative and necessary. Indeed, holding this lawsuit in abeyance until after the S.E.C. potentially sues Plaintiffs in an unlawful enforcement action and raising thereafter the egregious and prejudicial violations set forth in this Complaint as affirmative defenses in such action would be legally unavailing and would also cause the irreparable damages and chaos described above which could not be reversed including the loss of thousands of jobs, the stoppage of the building of thousands of homes and extreme societal impact. There is no longer any other recourse. The recent Supreme Court ruling in *Loper Bright Enterprises v. Raimondo,* 144 S. Ct. 2244 (2024), allows this Court to immediately correct administrative agencies that attempt to regulate in a manner inconsistent with any explicit authority granted by Congress.

12. While the Plaintiffs have been fully cooperative in the S.E.C.'s investigation conducted by the S.E.C.'s Denver Regional Office, Plaintiffs are now constrained to file this pre-enforcement action due to the concerns referenced above and the S.E.C.'s violation of case law. After acknowledging that it does not have all documents in its investigation, the S.E.C. has further indicated that it is setting a deadline and will decide without having complete documentation.

13. The S.E.C. continues to deviate from its ordinary course of investigation. In this case, it oversteps its lawful authority, including violating its own internal procedures and pronouncements by its key leaders.

14. The S.E.C., without understanding the Plaintiffs' businesses, has unreasonably investigated Plaintiffs for almost two years—without identifying a single possible Federal securities law violation. The S.E.C. has done so, even though the areas that the S.E.C. is purportedly investigating are outside the scope of the S.E.C.'s formal order authorizing the investigation and despite Plaintiffs' repeated pleas to discuss any potential resolution of the matter to ensure that the Broadstreet organization continues its endeavor to assist in building more than thirty thousand homes in areas of the country that are suffering severe housing shortages and as more fully detailed in Exhibit "A" attached hereto and incorporated herein.

15. The S.E.C. has also used abusive tactics to sustain and extend the business-disruptive and reputation-damaging investigation, violating federal law. The plaintiff's constitutional rights have been violated as the S.E.C.'s actions below do not meet the definitional term of "Regulation" prescribed by Congress, violating the legal precedents of the *Loper* and *Private Fund* cases. For example, the S.E.C. has:

- advised that because of Plaintiffs' (the Broadstreet organization's) large business size and substantial assets, the S.E.C. must continue to investigate—including explicitly stating that if the Broadstreet organization was worth substantially less than it is, it would have ended the investigation already and taken no action;
- provided explicit directives regarding how Plaintiffs should run their private businesses, which has thwarted Plaintiffs from expanding or operating their businesses as effectively as possible and dictating operations when the S.E.C. is not empowered to do so;
- indicated it would require more comprehensive fee disclosures to BSGF's investors, despite that BSGF is a private fund and thereby is not necessary to have such disclosures beyond the fee formulas it reveals prominently to all of its investors and for which the investors have agreed;
- dictated the amount and manner in which BSGF may pay its managers and related service providers even though agreed to by its investors;

- dictated how investments are collected and distributions are deployed, again, despite investor-specific signed approval of such;

- dictated the specific way investors may review and approve disclosures, that is, for example, objected to disclosures being in a data room and incorporated by reference into PPM documents, although investors have accepted the same process;

- rejected Plaintiffs' voluntary offers of information—that is, to educate the S.E.C., the staff of which likely have no experience operating a real estate business of any magnitude—let alone of this magnitude—and chosen to subpoena third-parties for those identical records, causing a strain, and sometimes, a total loss of the relationships with the third-parties;

- repeatedly asked for numerous documents/information that have been produced to the S.E.C. and that are in possession of the S.E.C;

- required seemingly endless sittings of investigative testimony from Plaintiffs—in which the S.E.C. posed similar questions on the same topics for which the witnesses have already provided answers—to attempt to elicit and manufacture any inconsistent testimony;

- demanded, under a threat of a subpoena enforcement action, that Plaintiffs waive the attorney-client privilege concerning conversations between employees or agents of the entities and their legal counsel and received attorney-client privileged information, and attempted to use such information even though no waiver was ever agreed to;

- interrupted witness testimony and demanded inopportune breaks to keep unfavorable testimony (that is, unfavorable to the S.E.C.'s theories) from Plaintiffs off the record;

- claimed interchangeably the applicability of the S.E.C. Rules of Practice to parts of its investigation but then claimed certain protections under the Federal Rules of Evidence or Federal Rules of Procedure for S.E.C.'s convenience;

- admonished and silenced—in lieu of any substantive response—Feingold for sending a letter to the S.E.C. (Exhibit "A"), which outlined and indicated that Plaintiffs are "ready, willing and able" to resolve the matter but are critical of the S.E.C.;

- rejected Plaintiffs' offer to provide contextual information about a questionable witness (the Witness) on which the S.E.C. relies on for information about Plaintiffs' businesses—a former business associate witness with unsavory connections who has used illegal tactics to extort Plaintiffs in a separate, unrelated litigation; and

- on information and belief, shared details of this "private" investigation with the above-mentioned Plaintiffs' litigation adversary, in violation of S.E.C. rules of privacy.

- ignored the fact that the S.E.C.'s threatened action will trigger certain "bad boy" and loan covenant provisions and wreak havoc even though under the *Loper* and *Private Funds* cases, the S.E.C. may not regulate some, if not all of the Plaintiffs.

- increased retaliatory action, including refusing to have open and accessible contact and resolution communications as directed in the S.E.C.'s rules, after Plaintiffs hired a well-known lawyer. This lawyer had previously been involved in proceedings that resulted in the termination of S.E.C. officials after lies that those officials had made to a federal judge were exposed.

- forced involuntary disclosures of the attorney-client privilege by using other divisions of the S.E.C., including the division responsible for brokerage firm oversight and regulation, to collect emails and documents from businesses communicating with attorneys and which are owned by the Plaintiffs so they can see confidential information. After using such confidential documents at depositions, and being warned of their improper conduct, the S.E.C. days later feigned ignorance of any improper collection of privileged information.

- refused to reschedule depositions to allow them to take place with all counsel present, resulting in counsel's only option for appearance to be by video due to scheduling conflicts. The S.E.C. then refused to accommodate counsel appearing by video by refusing to allow counsel to see the exhibits used in depositions.

- indicated that it set a deadline for filing an action against Plaintiffs despite acknowledging that it does not have all documents in its investigation completely received and reviewed, and that the decision of whether to file the action will be decided without complete review of the documents.

16. The S.E.C. has also continued to "investigate" this matter, even though every investor in BSGF has received all payments to which they are entitled under their investment documents. Not surprisingly, BSGF has not received any material complaints from any investor. In other words, there is no harm to a single investor. Again, it bears repeating that virtually all the investors signed an acknowledgment confirming acceptance of the business practices of not only BSGF but the Broadstreet universe of entities, and the S.E.C., angered by the execution of this document by investors, treated this investors' acknowledgment with disdain as such acknowledgment eviscerates the S.E.C.'s position.

17. The individual Plaintiffs are personally subject to several provisions in private funding agreements for most B.S.I. real estate projects. Any violation, caused by even an unlawful enforcement action, would trigger a series of defaults that would terminate project funding and cause many civil lawsuits from Broadstreet's project partners. Such an action would cause a catastrophic result: thousands of jobs would be lost, and thousands of homes would not be built in an area of the country (the Carolinas) where the housing shortage is severe. The above-described Broadstreet entities are critical to completing over 30,000 housing sites representing five of the most prominent publicly traded homebuilders in the United States.

18. Throughout the investigation, the S.E.C. has attempted to "regulate" Plaintiffs by using coercive tactics that directly contravene statutory mandates, the Constitution, the pronouncements of the S.E.C.'s own Division of Enforcement Manual, and the law of the Supreme Court and the Fifth Circuit Court of Appeals. In so doing, the S.E.C. continues to target Plaintiffs' businesses because of their size and the amount of assets they control and prejudice their ability to adequately defend themselves against any potential collapse of their business.

19. Accordingly, Plaintiffs are entitled to injunctive relief enjoining the S.E.C. from violating Plaintiffs' constitutional rights and other federal law by acting in an unreasonable manner and beyond its authority.

## PARTIES

20. Plaintiff B.S.I. is a corporation organized under the laws of Delaware and headquartered in Greenville, South Carolina. B.S.I. is a diversified multi-disciplined private equity firm primarily offering oversight and management services in land development, home development, hotel and lodging, land banking as well as other industries described on the website

www.broadstreetprivateequity.com. B.S.I. conducts hundreds of millions dollars in business each year.

21. Plaintiff BSGF is a private fund organized under Delaware law with its principal place of business in South Carolina. BSGF collects investors' funds for investment into various project lines to generate returns for investors. BSGF receives investors' funds only from accredited investors under exempt transactions under the Federal securities laws. BSGF maintains a significant number of its investors from, and conducts millions of dollars in business transactions in, the Fort Worth, Texas area. Many of BSGF's transaction counterparties and business relationships are also located in the State of Texas and Fort Worth in particular. BSGF funds the projects that B.S.I., a separate private company, oversees, develops, and manages, including the thousands of homesites for the homebuilders referenced in this Complaint and the financial/lender's entities in Fort Worth, Texas.

22. Plaintiff BSGM is a limited liability company organized under the laws of South Carolina with its principal place of business in Greenville, South Carolina. BSGM manages BSGF, which is owned and managed by Plaintiffs Joseph and Steven Baldassarra.

23. Plaintiff Feingold is a citizen and resident of Florida. He is the C.E.O. of B.S.I. since June of 2022. Feingold is also a lawyer in good standing with an active license.

24. Plaintiff Joseph Baldassarra is a citizen and resident of South Carolina. He founded BSGF in 2015 with his brother, Steven Baldassarra. Joseph Baldassarra serves as president of B.S.I. and co-fund manager of BSGF through BSGM, of which he is an equal owner to Steven Baldassarra.

25. Plaintiff Steven Baldassarra is a citizen and resident of South Carolina. He founded BSGF in 2015 with his brother, Joseph Baldassarra. Steven Baldassarra serves as Chief Operating Officer of B.S.I. and co-funding manager of BSGF through BSGM, of which he is an equal owner with Joseph Baldassarra.

26. Defendant S.E.C. is an administrative agency of the federal government and has a regional office in Fort Worth, Texas.

## **JURISDICTION AND VENUE**

27. This Court has subject matter jurisdiction under 28 USC § 1331, as this action arises under the Constitution, the federal courts' equitable powers, the Securities Act of 1933, 15 USC § 77a *et seq.* (the "Securities Act"), and the Securities Exchange Act of 1934, 15 USC § 78a *et seq.* (the "Exchange Act").

28. Venue is proper in this District because BSGF transacts significant business in this District through its investments and operations and provides funding for B.S.I. projects. B.S.I.-related entities conduct business with a homebuilder in Fort Worth and multiple lenders with offices in Fort Worth. Therefore, a substantial part of Plaintiffs' business gives rise to the claims in this District. Further, the S.E.C., which has a regional office in this District, regulates, investigates, participates in, and litigates actions and matters involving businesses and individuals in this District.

## **REGULATORY BACKGROUND**

29. "The S.E.C. is the federal administrative agency entrusted with the duty and power to regulate and control transactions in securities." *Ayers v. S.E.C.*, 482 F. Supp. 747, 749 (D. Mon. 1980). The term "securities" is statutorily defined to embrace a limited set of financial instruments,

including "stocks," "bonds," and similar investments. 15 U.S.C. § 77-b(a)(1). Private funds are explicitly excluded from the S.E.C.'s regulation. 15 U.S.C. § 80b-2(a)(29).

30. Under the Federal securities laws, the S.E.C. has broad discretion to regulate its subjects; however, it may not act unreasonably and beyond the scope of its authority. *S.E.C. v. Brigadoon Scotch Distributing Co.*, 480 F.2d 1047 (2d Cir. 1973); *see also Nat'l Assoc. of Private Fund Managers v. S.E.C.*, 103 F.4th 1097 (5th Cir. 2024) (holding that the S.E.C. exceeded its statutory authority in interpreting the "protection of investors" to include private fund investors).

31. Where an agency acts beyond the scope of its authority, "[c]ourts must exercise their independent judgment in deciding whether an agency has acted within its statutory authority. *Loper Bright Enter. v. Raimondo, 144 S. Ct. 2244, 2273 (2024).* Under *Loper*, agencies no longer enjoy *Chevron* deference, which allowed the courts to accept an agency's plausible interpretation of statutory language. Now, an agency "must point to explicit Congressional authority justifying [its] decisions." *Inhance Techs., LLC v. US EPA*, 96 F.4th 888, 893 (5th Cir. 2024).

32. Long before *Loper*, courts recognized non-statutory exceptions that allowed individuals to petition for the court's intervention where an agency acted outside the scope of its authority, especially in violation of constitutional rights. *Leedom v. Kyne*, 358 US 184 (1958); *Louisiana v. US EPA*, 2024 WL 250798 (WD La. Jan. 23, 2024).

33. The S.E.C. has several sources of guidance outlining the conduct that is and is not appropriate during an investigation and the boundaries within which the S.E.C. may operate, including the S.E.C. Enforcement Manual and statements by the Commission's leaders. For example, in a May 2022 speech, S.E.C. Division of Enforcement Director Gurbir Grewal clarified that while "[he] fully appreciate[s] and welcome[s] zealous advocacy [by defense counsel] . . .

dilatory or obstructive conduct is not zealous advocacy. It is behavior that frustrates our processes, puts investors at risk, and contributes to . . . declining trust [of the American people in the S.E.C.]." Grewal recognized that protracted investigations impose a high cost on those under investigation, including reputationally, financially, and psychologically. He emphasized the collective interest in keeping investigations moving quickly and efficiently.[3]

34. Director Grewal also noted that the Federal Rules of Evidence do not apply to investigative testimony and that repeated interruptions to testimony can erode trust between defense counsel and S.E.C. staff. He emphasized that the S.E.C. "will not play games during our investigations, negotiations, or litigations" and that the "enforcement process is not a bazaar." It is "a serious undertaking, and we all need to treat it with the respect it deserves."

## FACTS

### A. Broadstreet's Business

35. In or around 1999, Feingold met the Baldassarras through his private law firm that provided legal services to the Baldassarras. For nearly 25 years, Feingold and the Baldassarras have maintained a business relationship, with the Baldassarras often turning to Feingold for legal advice relating to their various businesses.

36. Joseph and Steven Baldassarra each have over twenty years of experience in the financial services industry. Before BSGF, the Baldassarras managed CJS Technology Select Fund, specializing in later-stage pre-IPO investments. Both began their careers as independent registered and licensed Series 7 brokers servicing high-net-worth clients.

[3] A copy of the speech can be found here: https://www.sec.gov/newsroom/speeches-statements/grewal-remarks-securities-enforcement-forum-west-051222.

37. In 2015, Joseph and Steven Baldassarra formed a predecessor entity to BSGF, ultimately becoming BSGF. BSGF has both series and subseries investors investing in different specific business industries. BSGF is managed only by BSGM under an operating agreement in which the Baldassarras are equal owners. The Baldassarras are responsible for the day-to-day operation of the fund, including managing investor funds and investigating new potential business lines with their partners. The Baldassarras, however, are not investment advisers as they meet certain exemption requirements and are not required to register with the S.E.C.

38. In 2022, the Baldassarras recognized the need for a person with the education, training and experience to oversee rapidly expanding real estate projects where some BSGF investors could invest. The Baldassarras offered Feingold the position of manager of BSGF. Feingold declined the offer, indicating that he did not want to take a position in which he would assume the company's existing liabilities or handle this type of investor relationship typical of operating a fund of investors. But Feingold, who was very familiar with real estate businesses through his law practice, was amenable to managing and operating the real estate business and related projects in which BSGF invested.

39. The Baldassarras thus formed B.S.I. (a completely separate and private business with no investors and no securities business). They appointed Feingold as the C.E.O. to oversee the building projects' physical construction, operation and management. Joseph and Steven Baldassarra serve as B.S.I.'s president and chief operating officer, respectively.

40. B.S.I. has become a leading real estate, infrastructure, and housing-focused private equity firm, generating over $3 billion in business transactions since its inception in 2022. B.S.I. engages in various business lines, although its primary focus is the real estate infrastructure and

development industry. B.S.I. operates within a vast network of development partners and special purpose entities that rely almost exclusively on B.S.I. to meet operational needs and deliver completed projects. B.S.I.'s projects are supported not only by investor funding, but by hundreds of millions of dollars in debt financing from some of the largest funds and institutions in the United States, including some in Fort Worth, Texas.

41. B.S.I. expects to bring a positive economic impact of $10 billion to the economy, projecting to assist with over 30,000 homesites and creating over 2,500 jobs from its multitude of projects.

42. Before becoming B.S.I.'s C.E.O. in 2022, Feingold has never had a role in BSGF or BSGM, both of which existed for years. He is not a director, officer, or manager of either BSGM or BSGF. He is not an owner of either entity. He has no decision-making or management authority regarding the fund's activities; nor does he receive any direct payment from the fund's activities, unlike how the Baldassarras are compensated. He has no signatory authority over either entity's bank or brokerage accounts. He does not have an office in the entities' principal offices in South Carolina. All fund-related documents make clear that the Baldassarras are the sole fund managers via BSGM. The organization's public website also describes the distinction between Feingold and the Baldassarras' roles in the entire Broadstreet organization. The website clarifies that B.S.I. oversees the projects and BSGF receives investor funds and is managed by BSGM.

**B. The S.E.C. Launches a Massive Fishing Expedition into Broadstreet's Business.**

43. In or about the summer of 2022, Plaintiffs learned of an informal inquiry the S.E.C. was conducting of their businesses.[4] Later, in December 2022, BSGF learned that the S.E.C.'s Division of Enforcement staff from the Denver Regional Office was formally investigating BSGF.

44. After learning of the formal investigation, BSGF offered to present a full overview of the Broadstreet organization and its complexities to the S.E.C. Such meetings are not uncommon during S.E.C. investigations. The S.E.C., however, rejected BSGF's offer and advised that it would only accept information in response to formal subpoenas and notices of testimony. BSGF would not be permitted to educate the S.E.C. or provide a narrative or information other than what the S.E.C. determined it wanted to see. To date, the S.E.C. has not allowed Plaintiffs to give a formal presentation to the staff and accordingly, it does not appear that the S.E.C. has a complete overview of the Broadstreet organization's operations, finances, or business plan. The S.E.C. repeatedly indicated that it could not get its arms around this massive business venture.

45. In the next several months, the S.E.C. sent about ten subpoenas to various entities in the Broadstreet organization. Contemporaneously, the S.E.C. made more requests for information by letter and on telephone calls. Plaintiffs cooperated throughout this period, at significant effort and expense, providing a detailed account of its organizational structure and business lines and producing nearly one million pages of documents for the S.E.C. Again, only that which the S.E.C. chose to look at was provided to the S.E.C. as the S.E.C. refused the Plaintiffs' offers to make presentations to educate and guide the S.E.C. about the Plaintiffs'

[4] Around the same time, Plaintiffs encountered a business dispute with a business associate who threatened to use an S.E.C. investigation as a tactic to resolve the business dispute.

businesses, the location of documents, the types of documents it relied upon to run their business and other similarly critical information.

46. Four times, the S.E.C. claimed that documents and information were missing from the Plaintiffs' production and threatened a subpoena enforcement action against Plaintiffs for alleged lack of cooperation. On each occasion, however, Plaintiffs showed that the documents and information the S.E.C. claimed it did not have were already included in Plaintiffs' prior productions and in the S.E.C.'s possession. Had the S.E.C. allowed Plaintiffs to make a voluntary presentation, they could have efficiently directed the S.E.C. to the information it sought. To date the S.E.C. still refuses this direction.

47. To avoid the loss of business relationships that could result from S.E.C. subpoenas to third parties, Plaintiffs also volunteered to turn over all their banking and financial records, which the S.E.C. did not formally request. It is well known that many businesses will cease relationships with any individual or entity that even receives an S.E.C. subpoena. The S.E.C. refused the Plaintiffs' proposed production of such records and instead issued subpoenas to Plaintiffs' banks and business associates. As a result, several banks terminated their banking relationship with the Broadstreet entities, and certain professionals did so as well.

48. BSGF's auditor also resigned after receiving an S.E.C. subpoena, which forced BSGF to engage a different audit firm and caused significant delays in delivering its financial statements. The S.E.C. now criticizes the timeliness of the Plaintiffs' financial statements even though its needless subpoenas stymied their creation.

49. While the S.E.C. has mostly rebuffed or ignored Plaintiffs' voluntary disclosure of information about Broadstreet's business, it used the information Plaintiffs have provided to

significantly harm them, causing the loss of potential business opportunities. For example, after Plaintiffs voluntarily disclosed the name of an entity with which Plaintiffs conducted their business, the S.E.C. subpoenaed that entity, causing it to terminate its business relationship with Plaintiffs altogether.

50. The continued S.E.C. investigation has also significantly interfered with and caused resulting prejudice to Plaintiffs' ability to develop new business relationships and operate its business effectively, as the potential taint of an S.E.C. investigation has repelled potential partners. For example, the S.E.C. has directed Plaintiffs not to change their corporate structure or hold major corporate events while under investigation. The S.E.C. has suggested its lack of approval of certain officers and directors even though all shareholders and investors approve of the same and the Plaintiffs are private companies. Further, Plaintiffs' attempt to procure a premier advisory group for their business, which includes a former Federal prosecutor and former director of one of the top audit firms in the United States has been halted because of the conduct of the S.E.C.

51. The S.E.C. has said it wants BSGF to make more comprehensive disclosures relating to its fee calculation to its investors, despite that all monthly and quarterly reports, annual updates, pitch decks, and data room in which such disclosures are kept describe the formula BSGF uses to calculate management fees and complies with the *Private Funds* case.

52. The S.E.C. has also sought to dictate how BSGF may pay its managers and related entities, even though shareholders and investors have approved this. The S.E.C. has also tried to dictate how investments are collected, distributions are made and deployed, even though investors and shareholders approve of them. In addition, the S.E.C. has asserted that the way investors access

and approve BSGF's disclosures through an online data room is insufficient, again even though shareholders and investors have approved this method.

53. The S.E.C. has also contacted multiple investors of BSGF. Specific investors have indicated to Plaintiffs that they felt the S.E.C. was attempting to influence them to speak negatively of BSGF. Thus, in June 2023, Plaintiffs took the initiative of issuing a proactive compliance update. The update was sent to every BSGF investor. Approximately 97% of investors have now returned the acknowledgment form that they were aware of and accept all terms and conditions. Plaintiffs shared the updates with the S.E.C., which provoked a negative response from the S.E.C. staff suggesting that such communication could constitute a form of obstruction even though at present it is estimated that nearly 97% of investors accepted and confirmed the same.

54. The S.E.C. has also demanded that Plaintiffs waive the attorney-client privilege regarding conversations between the entities' employees and/or agents and their legal counsel. The S.E.C. has again threatened to file a subpoena enforcement action against Plaintiffs for failure to comply with this request. Further, the S.E.C. obtained attorney-client privileged documents without the Plaintiffs knowledge and then tried to use those documents in depositions to cause a waiver of the privilege.

55. As of this filing, the S.E.C. has conducted a formal investigation for nearly two years and has taken testimony from multiple witnesses several times. Indeed, the S.E.C. has required Feingold to testify over five days. Steven Baldassara and Joseph Baldassarra have also had to testify four and three times each, respectively, for a total of seven full days for both. During testimony, the S.E.C. interrupted witness testimony. It demanded breaks at inopportune times to keep unfavorable testimony that may contradict the S.E.C.'s theories off the record.

56. Additionally, the S.E.C. has changed the "ground rules." For example, the S.E.C. revealed at the beginning of each investigative testimony session that the S.E.C. Rules of Practice apply. However, whenever the S.E.C. requested breaks to speak with Plaintiffs' counsel, the S.E.C. asserted confidentiality under the Federal Rules of Evidence. In fact, no settlement discussions took place. Instead, the S.E.C. cloaked discussions that would reflect unfavorably on the S.E.C. If the Federal Rules of Procedure and Evidence were applied to the entire investigation, then the S.E.C. would be limited to one seven-hour deposition for each witness rather than allowed to take countless hours of testimony on the same topics. Yet, the S.E.C. seems to decide when and what rules it will use.

57. Despite the S.E.C.'s unreasonable course of conduct, Plaintiffs remain cooperative in resolving the S.E.C.'s investigation. On April 19, 2024, Feingold submitted a letter to the S.E.C. (Exhibit "A") further outlining, among other things, the status of specific projects at B.S.I., with videos showing its facilities and operations. The letter also emphasized the dire consequences the Broadstreet entities will face from continued investigation without an avenue for resolution.

58. For example, the April 19th letter explained that potential allegations against Feingold himself would trigger several "bad boy" or "event of default" provisions across several funding agreements for B.S.I. projects, potentially making Feingold personally liable for hundreds of millions of dollars of corporate debt but beyond that, cause project failures. A cascade of defaults would likely result, tearing away the foundation of B.S.I.'s building projects, which, in turn, will cause the loss of thousands of jobs and hundreds of millions of dollars of losses, adversely affecting homebuilding and the economy. The letter stated that failure to meet project obligations would also result in a slew of civil lawsuits by B.S.I.'s partners, many of which rely

exclusively on the Broadstreet entities to meet operational needs and, ultimately, homes being built.

59. In response, the S.E.C., through its staff, reprimanded Feingold for sending this communication and advised that he should not send any further similar communications in writing. The S.E.C. staff's response directly contradicts the S.E.C.'s Enforcement Manual, which stresses that "it is important that outside persons involved in investigations feel that they may contact the staff in the Division without hesitation, including senior officials." S.E.C. Enforcement Manual, pp. 28. Even more important, the S.E.C.'s unreasonable conduct chilled Feingold's freedom of expression (on relevant matters).

60. Following receiving Feingold's April 19th letter, the S.E.C. retaliated and demanded that Feingold, Steven Baldassarra, and Joseph Baldassarra should now each appear for yet more testimony. This time, the S.E.C. said testimony will be taken by an S.E.C. trial counsel, which is unusual for S.E.C. investigative testimony, and videotaped. Any lawyers appearing by zoom, which a large number of Plaintiffs lawyers would do so, would not be allowed to see the exhibits provided to the witnesses. The additional testimony was redundant and appeared to be an attempt to elicit and manufacture inconsistent testimony by repeatedly asking witnesses about the same topics for which they had previously testified. Furthermore, a well-known securities lawyer was hired who had been responsible for the firing of some S.E.C. officials for lying to a federal judge and the S.E.C. seemed most perturbed about the hiring and appearance of this counsel.

61. The S.E.C.'s retaliation to Feingold's April 19th letter, alongside their instructions for Feingold to not send any further similar communications in writing could be reasonably

interpreted as intimating that further retaliation would follow if Feingold sent any further similar written communications.

62. The S.E.C. has also dismissed Plaintiffs' request for a meeting for regulatory guidance with other divisions of the S.E.C. Instead, the S.E.C. has said it must continue with the investigation because of the Broadstreet entities' substantial size and revenue.

**C. Feingold Is Not a Manager, Investment Adviser, or Control Person of BSGF.**

63. From the S.E.C.'s actions and questions asked during investigative testimony, particularly regarding Feingold's role with BSGF, the S.E.C. is casting Feingold as manager of BSGF, an investment adviser, or a control person of BSGF. However, testimony and evidence amply show that he is not. Feingold's role is critical because many of the "bad boy" provisions and loan covenants specifically involve him. Hence, naming him in any action, as referenced in Exhibit "A" could have ruinous consequences.

**1. Feingold is not a Manager of BSGF.**

64. An investment fund manager oversees investment portfolios and makes decisions that affect the performance and success of the funds they manage.

65. Feingold is not a manager of BSGF. Rather, BSGF is managed by BSGM of which Joseph and Steven Baldassarra are the sole owners and managers. The Baldassarras exercise exclusive authority over all investment decisions and investor solicitations for BSGF, as they have repeatedly testified. Feingold oversees the construction and delivery of the infrastructure projects through a separate entity as allowed by BSGF's private placement documents. Finally, Feingold provides legal advice on *ad hoc* basis, as necessary. Feingold's involvement is with B.S.I., the most critical entity to developing and managing the infrastructure projects.

**2. Feingold is not an Investment Adviser of BSGF.**

66. For a person to be an investment adviser, he must (1) provide advice or analysis about securities either by making direct or indirect recommendations to clients or by providing research or opinions on securities or securities markets; (2) receive compensation for the advice provided; and (3) engage in a regular business of providing advice about securities.

67. Feingold meets none of the elements to be an investment adviser.

68. *First*, Feingold is the C.E.O. of B.S.I., an entity that cultivates and manages construction and real estate projects. Although investors can get exposure in B.S.I.'s real estate projects through a particular subseries in BSGF, Feingold has punctiliously not provided any advice regarding their investments in BSGF. In fact, BSGF's investors have executed acknowledgment forms to confirm this.

69. *Second*, BSGF is managed exclusively by BSGM, an entity owned and managed by Joseph and Steven Baldassarra. BSGM receives management fees from BSGF, which are distributed to the Baldassarras. Not surprisingly, Feingold does not receive compensation from BSGF or BSGM or in connection with providing investment advice.

70. Finally, Feingold does not engage in the business of providing advice about securities. Feingold holds no decision-making authority, managerial role, or oversight regarding BSGF, the only entity in the Broadstreet structure that receives and manages investor funds. He has no oversight of investor funds. Feingold is involved in B.S.I.

**3. Feingold is not a Control person of BSGF.**

71. The S.E.C. can impose liability on any person who possesses, directly or indirectly, the power to direct or cause the direction of the management or policies of an entity subject to its regulation.

72. Feingold is not a control person of BSGF. As established by testimony and in the nearly one million pages of documents produced by Plaintiffs to the S.E.C., including internal organizational communications and public investor documents, BSGF is controlled and operated by Joseph and Steven Baldassarra. Feingold does not influence Baldassarras' investment decisions. Feingold has no authority to accept, direct, or disburse investors' funds. He exercises no control over the Baldassarras, who have operated BSGF (and its predecessor) for nearly seven years before Feingold joined B.S.I. As described above, in 2022, Feingold explicitly declined the Baldassarras' offer to serve as a manager role in BSGF before forming B.S.I.

**FIRST CLAIM FOR RELIEF**
**(Agency Action in Excess of Statutory Authority)**

73. Plaintiffs re-allege and incorporate by reference here the allegations in paragraphs 1 through 72.

74. A plaintiff may "institute a non-statutory review action" against an agency "for allegedly exceeding [its] statutory authority." *Chamber of Com. of US v. Reich*, 74 F.3d 1322, 1327-28 (D.C. Cir. 1996). "The non[-]statutory review action finds its jurisdictional toehold in the general grant of federal question jurisdiction of 28 USC § 1331." *Rhode Island 'Dep't of Envtl. Mgmt. v. US*, 304 F.3d 31, 42 (1st Cir. 2002).

75. A court may review non-final agency actions based on allegations that the agency has plainly exceeded its statutory authority that threatens to "wholly deprive the [party] of a meaningful and adequate means of vindicating its . . . rights." *Rhode Island*, 304 F.3d at 42 (internal quotation marks and citations omitted) ("[E]ven after the passage of the APA, some residuum of power remains with the district court to review agency action that is ultra vires."). *See also Veldhoen v. US*, 35 F.3d 222 (5th Cir. 1994) ("a claim that an agency action is in plain contravention of a statutory mandate . . . may present one of the extraordinary exceptions to the finality requirement [of the APA]."). Indeed, the Supreme Court has fashioned clear non-statutory rights of review in such instances. *Leedom v. Kyne*, 358 US 184 (1958); *Louisiana v. US EPA,* 2024 WL 250798 (WD La. Jan. 23, 2024).

76. The burden is even lower under *Louisiana*, in which a court may review an agency's non-statutory ultra vires act if plaintiffs can (1) "identify some agency action affecting [it] in some specific way; and (2) "show that [it] has been adversely affected or aggrieved by that action." *Louisiana*, 2024 WL 250798 at *24 (citing *Apter v. HHS*, 80 F.4th 579, 585 (5th Cir. 2023). "The action need not be final." *Louisiana,* 2024 WL 250798 at *24. "To satisfy the aggrievement requirement, the plaintiff must establish that the injury he complains of falls within the 'zone of interest' sought to be protected by the statutory provision whose violation forms the legal basis for his complaint": (1)"identify some agency action affecting [it] in some specific way; and (2) "show that [it] has been adversely affected or aggrieved by that action." *Id*. (internal quotation marks and citations omitted). "The action need not be final." *Id.*

77. The S.E.C.'s authority to empower its staff to conduct an investigation, including to subpoena witnesses and take evidence, is limited to those "necessary and proper for the enforcement of" the Securities Act. 15 U.S.C. § 77s(c).

78. The S.E.C.'s "power to investigate carries with it the power to defame and destroy." 17 CFR 200.66. The S.E.C. staff must concern themselves only with the facts known to them and the reasonable inferences from those facts. *Id.* A member should never suggest, vote for, or participate in an investigation aimed at a particular individual for reasons of animus, prejudice or vindictiveness." *Id.* The S.E.C. shall also not make any "public pronouncement of the pendency of such an investigation should be made in the absence of reasonable evidence that the law has been violated and that the public welfare demand it." *Id*

79. The S.E.C. is a federal agency whose authority to regulate is limited to transactions in "securities." The term "securities" is statutorily defined to embrace a limited set of financial instruments, including "stocks," "bonds," and similar investments. 15 U.S.C. 77-b(a)(1).

80. Overseeing real estate development projects is not a security and involves no securities transaction. However, the S.E.C. seeks to regulate B.S.I., a privately-held entity that deals entirely with overseeing real estate projects, and Feingold for his role as C.E.O. of B.S.I. Further, B.S.I. does not issue securities or raise funds from investors. Therefore, the S.E.C. exceeds its proscribed authority in attempting to regulate B.S.I.

81. Additionally, private funds are explicitly excluded from the S.E.C.'s regulation. 15 USCA § 80b-2(a)(29). Private funds are pooled investment vehicles not available to in the public securities market and non-professional investors or "retail investors." *Nat'l Assoc. of Private Fund Managers v. S.E.C.*, 103 F.4th 1097, 1101 (5th Cir. 2024) (holding that the S.E.C. exceeded its statutory authority in interpreting the "protection of investors" to include private fund investors). "Instead, they are open to some of the most sophisticated and wealthiest investors." *Id.* "Investment vehicles that remain private and available only to highly sophisticated investors have

historically been understood not to present the same dangers to the public markets." *Id.* at 1110 (citations and internal quotation marks omitted).

82. BSGF is a private fund. It does not offer its securities in the public market and only accepts investments from sophisticated investors. BSGF provides details about how management fees are calculated in monthly and quarterly reports, annual updates, and in the data room where fund data is housed. Yet, the S.E.C. insists that BSGF make more detailed disclosures. The S.E.C. may not assert its authority over BSGF, let alone require disclosures that courts have explicitly found the S.E.C. has no authority to impose.

83. Furthermore, under the Advisers Act, an "[i]nvestment adviser" includes "any person who, for compensation, engages in the business of advising others, either directly or through publications or writings, as to the value of securities or as to the advisability of investing in, purchasing, or selling securities." 15 U.S.C. § 80b-2(a)(11).

84. The S.E.C. may not regulate Feingold as an investment advisor of BSGF as he is not a director, officer, or manager of BSGM or BSGF. He is not an owner of either entity, nor does he hold any decision-making or management authority regarding the fund's activities. He does not provide any investment advice, and investors have executed acknowledgment forms to confirm this. He receives no direct payment from the fund's activities. Similarly, the S.E.C. may not regulate the Baldassarras as they fall into a proper categorical exemption and do not require registration with the S.E.C.

**85.** Despite this, Plaintiffs have been subject to destructive and defamatory conduct by the S.E.C. staff in the investigation that directly contravenes the S.E.C.'s statutory authority and violates Plaintiffs' Constitutional rights.

86. The S.E.C. has repeatedly refused to consider all facts known to them as it has rejected Plaintiffs' offer for voluntary information. Plaintiffs explained that they would turn over all their banking and financial records to avoid the loss of business relationships through S.E.C. subpoenas to third parties. The S.E.C. instead subpoenaed several third-party business relationships, resulting in the loss of critical relationships. The S.E.C. has even admonished Plaintiffs' voluntary offer of information. In response to Feingold's April 19, 2024 letter detailing the Broadstreet entities' various projects and the impact an enforcement action would have on them, the S.E.C. warned Feingold not to share this information again. The S.E.C. also refused to allow Plaintiffs to offer contextual information about a witness on which the S.E.C. relies – a witness who is a litigant in civil suits against Plaintiffs. The S.E.C. has exchanged information with this witness and/or his agents, who have used information about this "private" investigation as a potential bargaining chip for his gain and have made inferences of influence over the S.E.C., with which the S.E.C. is aware. The S.E.C. has demanded that Plaintiffs provide testimony on *ten* separate occasions, each time delving into the same topics and often asking the same questions about Plaintiffs' businesses. Despite Plaintiffs' repeated testimony and nearly one million documents supporting otherwise, the S.E.C. seeks to establish authority to regulate B.S.I. and BSGF and paint Feingold as a manager, investment adviser, or control person of BSGF, which he is not.

87. Meanwhile, the S.E.C. has repeatedly rejected Plaintiffs' request to discuss a potential resolution and refused to identify any possible charges Plaintiffs may face. In moving forward this way, the S.E.C. has ignored the information available because such facts do not fit within the scope of what appears to Plaintiffs to be its intended goal – to regulate entities and people outside of the scope of its authority.

88. Additionally, the S.E.C. has pursued the Broadstreet organization with prejudice, explicitly stating that it continues to pursue Plaintiffs after a near two-year investigation merely because the Broadstreet organization's size and value and suggested that the investigation would have ended if the organization had less value.

**89.** The S.E.C.'s investigation is an agency action that has substantively affected Plaintiffs' ability to run their business, threatening to destroy it entirely. The S.E.C.'s conduct falls directly within Plaintiffs' zone of interest that 17 CFR 200.66 seeks to protect.

90. Actions taken by an agency or official that are "ultra vires" may appropriately "be made the object of specific relief." *Apter v. Dep't of Health & Human Servs*., 80 F.4th 579, 587 (5th Cir. 2023).

91. Being subject to an unlawful "formal investigation" is a "'here-and-now' injury that a court can remedy." *Free Enter. Fund v. Pub. Co. Accounting Oversight Bd.*, 561 US 477, 487, 513 (2010). That injury will continue so long as the unconstrained investigation into Plaintiffs' business continues. *See Blinder, Robinson & Co. v. S.E.C.,* 692 F.2d 102, 106 (10th Cir. 1982).

92. The S.E.C.'s attempt to regulate B.S.I.'s real estate business and BSGF, a private fund, is beyond its authority's scope.

93. The Declaratory Judgment Act, 28 USC § 2201, allows a party faced with a "genuine threat of enforcement" to bring suit to seek a declaration to determine the legality of an expected government enforcement action. *MedImmune, Inc. v. Genentech, Inc*., 549 U.S. 118, 129 (2007). Plaintiffs face such a genuine threat here.

94. Accordingly, Plaintiffs are entitled to declaratory and injunctive relief preventing the S.E.C. from continuing this investigation or beginning an enforcement action against Plaintiffs based on the premise that Plaintiffs are outside of the S.E.C.'s reach and declaring that Feingold is not a manager, investment adviser, or control person of BSGF.

95. Plaintiffs have no adequate remedy at law. Monetary damages are insufficient to remedy the irreparable harm against Plaintiffs. *See Staffing Services Ass'n v. Flanagan*, 2024 WL 1050160, *8 (ND Ill. Mar. 11, 2024) ("With the costs of complying, potential penalties for not complying, business losses incurred thus far, and the inability to recoup losses, Plaintiffs have established more than a mere possibility of irreparable harm.").

**SECOND CLAIM FOR RELIEF**
**(Agency Action in Excess of Statutory Authority in Violation of the Administrative Procedure Act, 5 USC §§ 701-706)**

96. Plaintiffs re-allege and incorporate by reference here the allegations in paragraphs 1 through 72.

97. Administrative agencies must act within the bounds of their authority. *Utility Air Regulation Grp. v. EPA*, 573 US 302, 326 (2014). "It is true that while the S.E.C. is entitled to great freedom in conducting its investigations, it is not at liberty to act unreasonably, and in appropriate circumstances the court may inquire into the reasons for an investigation and into its effects." *S.E.C. v. Brigadoon Scotch Distributing Co*., 480 F.2d 1047 (2d Cir. 1973).

98. "Courts must exercise their independent judgment in deciding whether an agency has acted within its statutory authority, as the [Administrative Procedure Act] requires." *Loper Bright Enter. V. Raimondo*, 144 S. Ct. 2244, 2273 (2024). Accordingly, an agency "must point to explicit Congressional authority justifying their decisions." *Inhance Techs., LLC v. US EPA*, 96

F.4th 888, 893 (5th Cir. 2024). *See e.g., Kansas v. Dep't of Educ.*, 2024 WL 3273285 (D. Kan. July 2, 2024) ("The DOE is an administrative agency created by statute and, as such, only possesses the authority that Congress has provided) (internal quotation marks omitted). Where courts were once permitted to accept an agency's plausible interpretation of the statute in determining whether a clear statutory mandate was violated, agencies are no longer entitled to such deference. *Loper Bright Enter.*, 144 S. Ct. at 2273.

99. "The S.E.C. is the federal administrative agency entrusted with the duty and power to *regulate* and control transactions in securities." *Ayers v. S.E.C.,* 482 F. Supp. 747, 749 (D. Mon. 1980) (emphasis added). The term "regulate" is not statutorily defined.

100. As discussed above, Plaintiffs do not fall within the transactions the S.E.C. may "regulate." Even if they did, Plaintiffs have been subject to such unreasonable conduct in the investigation by the Commission's staff that their actions cannot be considered within the scope of "regulation."

101. The S.E.C. has stepped outside its role as a regulator and effectively injected itself as manager of Plaintiffs' businesses. The S.E.C. has explicitly directed Plaintiffs not to change the corporate structure of their companies or hold any significant corporate events. The S.E.C. has opined on the role and qualifications of specific individuals as officers of B.S.I. and BSGF. The S.E.C. has said BSGF should give investors more comprehensive disclosures about its fee structure, even though such disclosures are consistently available and approved by investors in the data room and are not legally required of private funds. Instead, the S.E.C. suggests that the way BSGF discloses information is insufficient. The S.E.C. also tried to dictate the amount and way BSGF pays its managers and related entities even though it was approved by investors and not

legally required. The S.E.C. also attempted to dictate how investments are collected, and distributions are deployed, again, despite investor approval and shareholder approval.

102. "Regulation" also does not permit the S.E.C. to use abusive tactics in its investigative efforts. For example, as described above, the S.E.C. threatened legal action against Plaintiffs for failing to waive the attorney-client's privilege between Broadstreet entities' employees/agents and counsel. The S.E.C. also threatened legal action after it repeatedly and mistakenly accused Plaintiffs of failing to produce certain requested documents/information when Plaintiffs proved they had already produced them and were in possession of the S.E.C. The S.E.C. has also asserted the S.E.C. Rules of Practice throughout the investigation to justify taking unlimited testimony but claimed confidentiality under the Federal Rules of Evidence to protect certain communications during that same testimony. The S.E.C. insisted on videotaping Plaintiffs' most recent testimony as proscribed by the Federal Rules of Civil Procedure despite allegedly proceeding under the S.E.C. Rules of Practice. Neither the S.E.C. Rules of Practice nor Congress grant the S.E.C. such authority.

103. None of the S.E.C.'s actions as described herein are expressly delegated by Congress and the S.E.C. is acting beyond the scope of its authority in trying to "regulate" Plaintiffs in this manner.

104. Accordingly, Plaintiffs are entitled to injunctive relief preventing the S.E.C. from continuing this investigation or beginning an enforcement action against Plaintiffs based on the premise that Feingold is a manager, investment adviser, or control person of BSGF.

105. Plaintiffs have no adequate remedy at law. Monetary damages are insufficient to remedy the irreparable harm against Plaintiffs. *See Staffing Services Ass'n v. Flanagan*, 2024 WL 1050160, at *8.

**THIRD CLAIM FOR RELIEF**
**(Agency Action in Excess of Statutory Authority)**

106. Plaintiffs re-allege and incorporate by reference here the allegations in paragraphs 1 through 72.

107. "The S.E.C. is the federal administrative agency entrusted with the duty and power to *regulate* and control transactions in securities." *Ayers v. S.E.C.,* 482 F. Supp. 747, 749 (D. Mon. 1980) (emphasis added). The term "regulate" is not statutorily defined under the securities laws.

108. "It is true that while the S.E.C. is entitled to great freedom in conducting its investigations, it is not at liberty to act unreasonably, and in appropriate circumstances the court may inquire into the reasons for an investigation and into its effects." *S.E.C. v. Brigadoon Scotch Distributing Co*., 480 F.2d 1047 (2d Cir. 1973). Indeed, administrative agencies must act within the bounds of their authority. *Utility Air Regulation Grp. v. EPA*, 573 US 302, 326 (2014).

109. Where an agency has acted ultra vires, "[c]ourts must exercise their independent judgment in deciding whether an agency has acted within its statutory authority[.]" *Loper Bright Enter. v. Raimondo*, 144 S.Ct. 2244, 2273 (2024). It is no longer up to the agency to determine the extent of its authority. Under *Loper*, the court may no longer defer to an agency's interpretation of statutory language. *See also Nat'l Assoc. of Private Fund Managers v. S.E.C.,* 103 F.4th 1097, 1101 (5th Cir. 2024). This edict is especially true when constitutional issues are at stake. *Louisiana*, 2024 WL 250798 at *25. Indeed, courts have been quick to correct the agency and invalidate its

action where the S.E.C. has purported to exercise its authority in violation of constitutional rights. *S.E.C. v. Jarkesy*, 144 S. Ct. 2117 (2024).

110. Here, the S.E.C.'s "regulation" of the Plaintiffs' business defies all reasonableness. Congress has never authorized the offensive actions taken by the S.E.C. in this case. Such actions do not fall under the definition of "regulation." The S.E.C. has explicitly directed Plaintiffs not to change the corporate structure of their businesses or hold any major corporate events. The S.E.C. has opined on the role and qualifications of specific individuals as officers of B.S.I. and BSGF, even though B.S.I. does not sell securities and BSGF is a private fund explicitly excluded from the S.E.C.'s authority. The S.E.C. has dictated that BSGF provide investors with more comprehensive disclosures about its fee structure, despite being explicitly exempted from the S.E.C.'s authority, and suggests instead that the way BSGF makes its disclosures is insufficient. The S.E.C. has also tried to restrict the amount and way BSGF pays its managers and related entities and require its private placement memorandum (PPM) to include disclosures regarding the sharing of fees with non-managers, even though investors approved the PPM and again not legally required. The S.E.C. has also tried to dictate how investments are collected and distributions are deployed, again, despite investors' approval and outside of the S.E.C.'s authority.

111. While Plaintiffs have done everything they can to cooperate and resolve this matter, the S.E.C. has not been accorded the same consideration. Indeed, ignoring Director Grewal's guidance, the S.E.C. has let the "cloud of investigation" hang over Plaintiffs' businesses for nearly two years. The S.E.C. also continues to falsely claim that Plaintiffs have not produced certain documents under the threat of subpoena enforcement for Plaintiffs' alleged lack of cooperation. Four times, Plaintiffs have shown that the S.E.C. had the information it sought, suggesting to Plaintiffs that the S.E.C. has not reviewed the information Plaintiffs provided. Moreover, the

S.E.C. has explicitly stated that had Plaintiffs' businesses been less valued, the S.E.C. would have ended its investigation. According to the S.E.C., it continues to probe merely because of the Broadstreet organization's size and value.

112. Additionally, the S.E.C. appears to engage in the same "dilatory conduct" that Director Grewal warned about in destroying trust between the S.E.C. staff and defense counsel. The S.E.C. required that Plaintiffs provide countless hours of testimony, which has taken a financial and psychological toll on Feingold and the Baldassarras. During the same testimony, the S.E.C. disregarded Director Grewal's clear enunciation of the S.E.C.'s practice that the Federal Rules of Evidence do not apply to such proceedings. The S.E.C. instead asserted confidentiality under the Federal Rules of Evidence to protect certain communications during the testimony that Staff asserted was otherwise covered under the S.E.C.'s Rules of Practice. The S.E.C. has threatened legal action against Plaintiffs for failing to waive the attorney-client privilege between Broadstreet entities' employees/agents and counsel and received and used privileged information when it should not have. The S.E.C. has refused Plaintiffs' repeated offers of voluntary information, instead choosing to subpoena third parties, causing the loss of several key business relationships. The S.E.C. has turned the investigation into a "bazaar" that Director Grewal sought to avoid – with the S.E.C. staff flouting their authority. At the same time, Plaintiffs cooperate in the way expected.

113. As discussed above, the S.E.C.'s actions cannot fall within any reasonable meaning of "regulate." The S.E.C. has exceeded its authority in violation of Plaintiffs' Constitutional rights of free speech, protection against unreasonable seizures, and equal protection.

114. Courts may intervene where an agency has exceeded its authority, especially in violation of constitutional rights. *Leedom v. Kyne*, 358 US 184 (1958); *Louisiana v. US EPA*, 2024 WL 250798 (WD La. Jan. 23, 2024)

115. Accordingly, Plaintiffs have the right to injunctive relief preventing the S.E.C. from continuing this investigation or beginning an enforcement action against Plaintiffs based on the premise that Feingold is a manager, investment adviser, or control person of BSGF.

116. Plaintiffs have no adequate remedy at law. Monetary damages are insufficient to remedy the irreparable harm against Plaintiffs. *See Staffing Services Ass'n v. Flanagan*, 2024 WL 1050160, at *8.

**FOURTH CLAIM FOR RELIEF**
**(Agency Action in Violation of the First Amendment)**

117. Plaintiffs re-allege and incorporate by reference here the allegations in paragraphs 1 through 72.

118. "Injunctive relief has long been recognized as the proper means for preventing entities from acting unconstitutionally." *United States v. Trump*, 566 F. Supp. 3d 605, 645 (WD Tex. 2021), citing *Corr. Servs. Corp. v. Malesko*, 534 U.S. 61, 74 (2001). Importantly, "that an equitable action is available to challenge a violation of the United States' sovereignty does not rest on judicial or congressional recognition of a right of action under the specific constitutional right at issue." *United States v. Trump*, 566 F. Supp. 3d 605, 645 (WD Tex. 2021), citing *Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.*, 561 US 477, 491 n.2 (2010). Courts may declare agency actions that are not "rationally based" invalid. *Texas Rural Legal Aid, Inc. v. Legal Servs. Corp.*, 940 F.2d 685, 697 (D.C. Cir. 1991).

119. "Where comments of a government official can reasonably be interpreted as intimating that some form of punishment or adverse regulatory action will follow the failure to accede to the official's request, a valid claim [for violation of First Amendment rights] can be stated." *Hammerhead Enter., Inc. v. Bezenoff*, 707 F.2d 33 (2d Cir. 1983).

120. During the investigation, the S.E.C., through its staff, has tried to silence and chill the Plaintiffs' free speech rights under the specter of regulatory investigation. For example, on April 19, 2024, Feingold sent a letter detailing the Broadstreet entities various projects and the impact an enforcement action would have on them. Feingold included supporting materials, and urged the S.E.C. for a resolution. Instead of providing a substantive response, the S.E.C. repeatedly admonished and silenced Feingold, advising that he should refrain from sending such communication again—reflecting a foregone conclusion to bring an enforcement action against Plaintiffs, particularly Feingold.

121. The S.E.C.'s retaliation to Feingold's April 19th letter, alongside their instructions for Feingold to not send any further similar communications in writing could be reasonably interpreted as intimating that further retaliation would follow if Feingold sent any further similar written communications.

122. Because the S.E.C.'s unreasonable conduct violates the First Amendment, Plaintiffs have the right to injunctive relief preventing the S.E.C. from continuing any investigation or beginning an enforcement action based on the premise that Feingold is a manager of BSGF, an investment adviser, or a control person of BSGF.

123. There is no adequate remedy at law. Monetary damages are insufficient to remedy the irreparable harm against Plaintiffs. *See Staffing Services Ass'n v. Flanagan*, 2024 WL 1050160, at *8.

124. Permanent injunctive relief enjoining the S.E.C., its staff and agents, and all acting in concert with the S.E.C., from further investigating Feingold's role regarding BSGF is appropriate and necessary. The S.E.C.'s actions have unconstitutionally infringed on Plaintiffs' First Amendment rights of free speech to raise their serious and grave concerns about the S.E.C.'s unreasonable course of conduct in this investigation.

## FIFTH CLAIM FOR RELIEF
**(Agency Action in Violation of the Fourth Amendment)**

125. Plaintiffs re-allege and incorporate by reference here the allegations in paragraphs 1 through 72.

126. "Injunctive relief has long been recognized as the proper means for preventing entities from acting unconstitutionally." *United States v. Trump*, 566 F. Supp. 3d at 645. Importantly, "that an equitable action is available to challenge a violation of the United States' sovereignty does not rest on judicial or congressional recognition of a right of action under the specific constitutional right at issue." *United States v. Trump*, 566 F. Supp. 3d at 645. Courts may declare agency actions that are not "rationally based" invalid. *Texas Rural Legal Aid, Inc. v. Legal Servs. Corp.*, 940 F.2d at 697.

127. For nearly two years, the S.E.C. has failed, and explicitly refused, to identify the basis for its continued investigation. Instead, the S.E.C. said the Broadstreet organization's size and assets makes it a proper target for further investigation. The S.E.C. has restricted and

hamstrung Plaintiffs' business dealings and caused material harm through its investigative action, causing the prejudicial loss of, among others, real and tangible business opportunities, key banking partners, and necessary professionals. The S.E.C. has also imposed business directives on Plaintiffs, demanding that no changes be made to the Broadstreet organization's corporate structure and suggesting a lack of approval of certain officers even though shareholder and investor approval has been obtained. In essence, the S.E.C. has directed Plaintiffs how to run (or not to run) their business under threat of an enforcement action. And when Plaintiffs have made many attempts to approach the S.E.C. to resolve the matter, the S.E.C. has ignored or admonished their efforts. Accordingly, the S.E.C.'s unreasonable conduct in the investigation is unlawful and constitutes an unreasonable seizure under the Constitution's Fourth Amendment.

128. Because the S.E.C.'s unreasonable conduct in this investigation violates the Fourth Amendment, Plaintiffs have the right to injunctive relief preventing the S.E.C. from continuing any investigation or beginning an enforcement action based on the premise that Feingold is a manager of BSGF, an investment adviser, or a control person of BSGF.

129. Plaintiffs have no adequate remedy at law. Monetary damages are insufficient to remedy the irreparable harm against Plaintiffs. *See Staffing Services Ass'n v. Flanagan*, 2024 WL 1050160, at *8.

**SIXTH CLAIM FOR RELIEF**
**(Agency Action in Violation of the Fifth Amendment)**

130. Plaintiffs re-allege and incorporate by reference here the allegations in paragraphs 1 through 72.

131. "Injunctive relief has long been recognized as the proper means for preventing entities from acting unconstitutionally." *United States v. Trump*, 566 F. Supp. 3d at 645. Notably, "that an equitable action is available to challenge a violation of the United States' sovereignty does not rest on judicial or congressional recognition of a right of action under the specific constitutional right at issue." *United States v. Trump*, 566 F. Supp. 3d at 645. Courts may declare agency actions that are not "rationally based" invalid. *Texas Rural Legal Aid, Inc. v. Legal Servs. Corp.*, 940 F.2d at 697.

132. Here, the S.E.C. has intentionally treated Plaintiffs differently because of the Broadstreet organization's size and value. The S.E.C. has explicitly stated that it would have ended its investigation already if Plaintiffs' businesses were small and worth less. The S.E.C. has continued its investigation because Plaintiffs are simply "too big to let go" and held Plaintiffs' business in abeyance for over two years.

133. While it is the S.E.C.'s practice to generally engage with those under investigation and allow at least some presentations to be made and information to be voluntarily given, the S.E.C. has repeatedly rejected any offers from Plaintiffs and refused to respond to Plaintiffs' request for discussion of potential resolution.

134. Given the S.E.C.'s unreasonable course of conduct in this investigation, particularly regarding Feingold's role with BSGF, the threat of an S.E.C. enforcement action against Plaintiffs is direct, genuine, imminent, and real. Accordingly, Plaintiffs have been deprived of equal protection under the Constitution's Fifth Amendment (Due Process Clause).

135. The S.E.C.'s position contradicts the statute, precedent, and all other evidentiary information it has gathered. This action is, therefore, appropriate to allow Plaintiffs to resolve the

considerable uncertainty and risk to their business created by the S.E.C.'s threatened enforcement action.

136. Preliminary and permanent injunctive relief enjoining the S.E.C., its staff and agents, and all acting in concert with the S.E.C., from further investigating Feingold's role with BSGF is appropriate and necessary.

137. Plaintiffs have no adequate remedy at law. Monetary damages are insufficient to remedy the irreparable harm against Plaintiffs. *See Staffing Services Ass'n v. Flanagan*, 2024 WL 1050160, at *8.

**SEVENTH CLAIM FOR RELIEF**
**(Agency Action in Excess of Statutory Authority in Violation of the Administrative Procedure Act, 5 USC §§ 701-706)**

138. Plaintiffs re-allege and incorporate by reference here the allegations in paragraphs 1 through 72.

139. "Sanction" as defined by the Administrative Procedure Act, includes, but is not limited to, an "agency prohibition, requirement, limitation, or other condition affected the freedom of a person." U.S. Code 5 § 551(10)(A).

140. During the S.E.C.'s investigation of Plaintiffs, its employees have issued multiple sanctions against Plaintiffs on behalf of the S.E.C.

141. The only inference to draw from these sanctions is that the S.E.C.'s employees want Plaintiffs to act in compliance with the S.E.C. employees' will under the color of authority of the S.E.C.

142. Such sanctions, however, are *ultra vires*.

143. Plaintiffs are entitled to a declaratory judgment from this Court that the sanctions issued by the S.E.C.'s employees during the S.E.C.'s "investigation" are issued under the color of the authority of the S.E.C.

144. Plaintiffs are also entitled to a declaratory judgment that the S.E.C. lacks authority to issue the sanctions to Plaintiffs during the "investigation."

145. Plaintiffs are further entitled to injunctive relief preventing the S.E.C. from continuing to pursue its "investigation" of Plaintiffs pending resolution of this action.

146. Finally, Plaintiffs entitled to a permanent injunctiion preventing the S.E.C. from (a) picking and choosing which sanctions issued by its employees during an S.E.C. "investigation" are issued under the color of the authority of the S.E.C. and (b) issuing sanctions to Plaintiffs that the S.E.C. is not authorized to issue.

147. Plaintiffs have no adequate remedy at law. Monetary damages are insufficient to remedy the irreparable harm against Plaintiffs. *See Staffing Services Ass'n v. Flanagan*, 2024 WL 1050160, at *8.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that the Court enter a Final Judgment:

### I.

Restraining, enjoining, and prohibiting the Commission and its officers and agents from pursuing any investigation, sanction or enforcement action outside the scope of its authority;

**II.**

Restraining, enjoining, and prohibiting the Commission and its officers and agents from pursuing any investigation or enforcement action premised on the assertion that Feingold is a manager, investment adviser, or control person of BSGF, and violating the First, Fourth, and Fifth Amendments of the Constitution of the United States of America;

**III.**

Restraining, enjoining, and prohibiting the Commission and its officers and agents from pursuing any investigation or enforcement action in violation of the First, Fourth, and Fifth Amendments;

**IV.**

Declaring that B.S.I., BSGF, Joe Baldassarra, and Steven Baldassarra are not subject to the S.E.C.'s regulation;

**V.**

Declaring that Feingold is not a manager, investment adviser, or control person of BSGF;

**VI.**

Declaring that sanctions issued by the S.E.C.'s employees to Plaintiffs during an S.E.C. "investigation" are issued under the color of the authority of the S.E.C.;

**VII.**

Declaring that the S.E.C. lacks authority to issue the sanctions imposed on Plaintiffs during the SEC's "investigation;"

**VIII.**

Awarding Plaintiffs their reasonable costs, including attorneys' fees, incurred in bringing this action under 28 USC § 2412, or other applicable law; and

**IX.**

Granting Plaintiffs such other and further relief as this Court deems just and proper.

**JURY DEMAND**

Plaintiffs demand a trial by jury.

Respectfully submitted,

BROZYNSKI & DALTON PC

DATED: January 2, 2025

By: */s/ Katarzyna Brozynski*

KATARZYNA BROZYNSKI
Texas Bar No. 24036277
kasia@bdlegalgroup.com
BART DALTON
Texas Bar No. 24043418
bart@bdlegalgroup.com
ERIC KNUDSEN
Texas Bar No. 24120949
eric@bdlegalgroup.com
5700 Tennyson Parkway, Suite 300
Plano, Texas 75024
Telephone: 972.371.0679

Attorneys for PLAINTIFFS BROADSTREET, INC., BROADSTREET GLOBAL FUND, L.L.C., BROAD STREET GLOBAL MANAGEMENT, L.L.C., DAVID FEINGOLD, JOSEPH BALDASSARRA, and STEVEN BALDASSARRA.

CERTIFICATE OF SERVICE

I hereby certify that on this 2nd day of January, 2025, I filed or caused to be filed the foregoing with the Clerk of the Court using the CM/ECF system.

*/s/ Eric Knudsen*
Eric Knudsen